IN THE UNITED STATES DISTRICT COURT
NORTHER DISTRICT OF TEXAS
DALLAS DIVISION

BRETT MICHAEL SANDERS          §
                               §          CIVIL ACTION NO.
v.                             §          3:15-CV-02782-D
                               §
LIEUTENANT MIKE VINCENT, et al §


**<u>DEFENDANTS' SECOND MOTION & BRIEF TO DISMISS</u>**

# TABLE OF CONTENTS

I. SUMMARY OF MOTION……………………………………………………………………..1

II. IDENTIFICATION OF LIVE PLEADING & SUMMARY OF CLAIMS…………………2

    A. Live Pleading & Summary of Claims Against Defendants…………………………2
    B. Summary of Plaintiff's Allegations………………………………………………………3

III. LEGAL STANDARD FOR MOTION TO DISMISS…………………………………...5

IV. FAILURE OF § 1983 CIVIL RIGHTS CLAIMS……………………………………………6

    A. Overview of Civil Rights Claims……………………………………………………...6
    B. Plaintiff Does Not Meet Requirements for a Civil Rights Claim Against the City……..6

        1. Basic Facts Plaintiff Must Plead Against City……………………………………..6
        2. Plaintiff Does Not Identify A Policymaker………………………………………7
        3. Plaintiff Does Not Identify a Policy………………………………………………8

    C. Plaintiff Does Not Show a Civil Rights Violation Committed by Anyone……………8

        1. The First Amendment is No Talisman Barring the Officers' Conduct of
            Initiating & Carrying Out the Detention……...................................................9
            (a) General Standards for Investigatory Detention………………………..9
            (b) Initiating & Carrying Out the Detention was Lawful…………………..9
            (c) Failure of Claim that Detention was Retaliation Under First
                Amendment………………………………………………………………14
        2. Failure of Excessive Force Claim………………………………………………16
            (a) General Standards Governing Excessive Force Claims………………16
            (b) The Minimal Force Herein was Lawful……………………………….17

V. IMMUNITY OF INDIVIDUALS………………………………………………………18

VI. ALTERNATE REQUEST FOR A REPLY PURSUANT TO FED. R. CIV. P. 7(a)………19

    A. Overview of Plaintiff's Claims…………………………………………………19
    B. Requirements for Factually Specific Allegations……………………………………20
    C. Defendants' Specific Factual Assertions of Immunity………………………………20
    D. Complaint Is Not Sufficient……………………………………………………22

VII. DISCOVERY MUST BE STAYED……………………………………………………23

# <u>TABLE OF AUTHORITIES</u>

<u>STATUTES & RULES:</u>

Fed. R. Civ. P. 7(a)……………………………………………………………..19, 20, 23

Fed. R. Civ. P. 8(a)(2)………………………………………………………………...5

Fed. R. Civ. P. 12(b)(6)………………………………………………………1, 5-7, 22

Fed. R. Evid. 201……………………………………………………………...1-2

Tenn.Code § 39–17–1311(b)(1)(H)……………………………………………...10

Texas Penal Code § 46.01(3)(A) & (B)…………………………………………………3


<u>CASES:</u>

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)………………………………………5, 6, 8, 9, 20, 23

Backe v. LeBlanc, 691 F.3d 645 (5th Cir. 2012)…………………………………………23

Baker v. Putnal, 75 F.3d 190, 196 (5th Cir. 1996)………………………………………5

Baker v. Smiscik, 49 F.Supp.3d 489, 501 (E.D. Mich. 2014)……………………………...9, 11-14

Bell Atlantic Corporation v. Twombly, 550 U.S. 544, 568 fn 13 (2007)………………………2, 5

Bennet v. City of Slidell, 728 F.2d 762, 769 (5th Cir. 1984)………………………………………7

Board of County Commissioners v. Brown, 520 U.S. 397, 403 (1997)……………………………7

Braxton v. Fallis, 2005 WL 5977661 at p. 4-5 (N.D. Fla. 2005)…………………………………18

Chiras v. Miller, 432 F.3d 606, 611 (5th Cir. 2005)………………………………………...7

City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986)………………………………………9

City of San Benito v. Rio Grande Valley Gas Company, 109 S.W.3d 750, 757 (Tex. 2003)………8

City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988)………………………………………8

Condit v. Dunne, 317 F.Supp.2d 344, 357-8 (S.D.N.Y. 2004)…………………………………2

Crawford v. Geiger, 2015 WL 5569007 at pp. 8-9 (N.D. Ohio Sept. 22, 2015)…………………10

Crawford-El v. Britton, 523 U.S. 574, 597-598 (1998)…………………………………………20, 22

Devenpeck v. Alford, 543 U.S. 146, 153-154 (2004)………………………………………………15

Embody v. Ward, 695 F.3d 577, 579 (6th Cir. 2012)……………………………………………10-14

Escobedo v. State, 6 S.W.3d 1, 7 (Tex. App. – San Antonio 1999, discretionary rev. ref'd 2005)…3

Foreman v. Texas A&M Univ. Sys. Health Sci. Ctr., No. 3:08-cv-1469-L, 2008 WL 494267, at *4 (N.D. Tex. Nov. 12, 2008)…………………………………………………………………………..23

Glenn v. City of Tyler, 242 F.3d 307, 314 (5th Cir. 2001)…………………………………………17

Gonzalez v. Kay, 577 F.3d 600, 603 (5th Cir. 2009)………………………………………………5

Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989)…………..16, 18

Guidry v. Bank of LaPlace, 954 F.2d 278, 281 (5th Cir. 1992)……………………………………..7

Hamm v. Powell, 874 F.2d 766 (11th Cir.1989), mod. on rehearing, 893 F.2d 293 (1989)……….16

Hiibel v. Sixth Judicial District Court, 542 U.S. 177, 188 (2004)………………………………...13

Hogan v. Cunningham, 722 F.3d 725, 735 (5th Cir. 2013)…………………………………………19

Hunter v. Bryant, 502 U.S. 224, 227 (1991)………………………………………………………...23

In Re American Apparel, Inc. Shareholder Litigation, 2013 WL 174119 at p. 11-12 (N.D. Cal. 2013)………………………………………………………………………………………..2

Johnson v. Glick, 481 F.2d [1028], at 1033 [ (2d Cir.), cert. denied, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)]…………………………………………………………………...16

Kelly v. City of Carlisle, 622 F.3d 248, 262 (3rd Cir. 2010)………………………………………10

Lion Boulos v. Wilson, 834 F.2d 504 (5th Cir. 1987)………………………………………………23

Meadowbriar Home for Children, Inc. v. Gunn, 81 F.3d 521, 532-33 (5th Cir. 1996)…………..7, 9

Monell v. New York City Department of Social Services, 436 U.S. 658, 694 (1978)…………..7-9

Montgomery v. Killingsworth, 2015 WL 289934 at pp. 14-15 (E.D. Penn. Jan. 22, 2015)………10

Reischle v. Howards, 132 S.Ct. 2088, 2093 (2012)……………………………………………..14, 15

Schultea v. Wood, 47 F.3d 1427, 1430 (5th Cir. 1995)……………………………………..20, 22

Szymecki v. Houk, 353 Fed. Appx. 852, 853 (4th Cir. 2009)……………………………………..10

Spiller v. City of Texas City, 130 F.3d 162, 167 (5th Cir. 1997)……………………………………7

Tara Partners v. City of South Houston, 282 S.W.3d 564, 568 (Tex. App. – Houston [14th Dist.] 2009)…………………………………………………………………………………..8

Terry v. Ohio, 392 U.S. 1, 21-22 (1968)………………………………………9, 10, 12, 13, 15, 17

United States v. Sokolow, 490 U.S. 1, 9-10 (1989)………………………………………………...9

U.S. v. Campbell, 178 F.3d 345, 349 (5th Cir. 1999)…………………………………………..17

U.S. v. Hensley, 469 U.S. 221, 235 (1985)………………………………………………………17

U.S. v. Maltais, 403 F.3d 550 (8th Cir. 2005)…………………………………………………..14

U.S. v. Sharp, 470 U.S. 675, 685 (1985)………………………………………………………14

Valley Broadcasting Company v. U.S. District Court for Nevada, 798 F.2d 1289, 1290 fn 1 (1986)……………………………………………………………………………………………2

Wicks v. Miss. State Employees Servs., Inc., 41 F.3d 991, 994-95 (5th Cir. 1995)………………23

Williams v. Boggs, 2014 WL 585373 at p. 5 (E.D. KY Feb. 13, 2014)………………………10-11

Zapata v. Melson, ___ F.3d ___, 2014 WL 1545911 (5th Cir. Apr. 18, 2014)……………………23

IN THE UNITED STATES DISTRICT COURT
NORTHER DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| BRETT MICHAEL SANDERS | § | |
| | § | CIVIL ACTION NO. |
| v. | § | 3:15-CV-02782-D |
| | § | |
| LIEUTENANT MIKE VINCENT, et al | § | |

## <u>DEFENDANTS' SECOND MOTION & BRIEF TO DISMISS</u>

NOW COMES Defendant City of Addison, Lt. Mike Vincent, Officer T. Bagley, and Officer B. Jones, and in response to the November 9, 2015 "Plaintiff's First Amended Original Complaint and Jury Demand" (Doc. 17) (hereinafter "the Complaint") and hereby move for dismissal because Plaintiff has failed to state a claim within the meaning of Fed. R. Civ. P. 12(b)(6) for the following reasons:

## I. <u>SUMMARY OF MOTION</u>

Plaintiff brings a civil rights case against the City of Addison and three of its Police Officers based on a 20 minute encounter between Plaintiff and the individual Officers. Plaintiff describes himself as wearing shorts, a t-shirt, backpack, and a plainly visible holstered pistol while he was using a video camera mounted on a tripod to film Police activity at Police headquarters across the street from his location (Doc. 17 pp. 3-4 ¶ 14). The event occurred on June 25, 2015 (Doc. 17 p. 3 ¶ 13), seven weeks after two individuals were killed by a Garland, Texas Police Officer after firing shots at security Officers at the entrance to a City building in Garland, Texas – the Curtis Caldwell Center. The event was only 12 days after an individual opened fire on the entrance to the Dallas Police Department Headquarters building and that individual left a package of pipe bombs in the parking lot.[1] Plaintiff apparently contends that because he allegedly was exercising First

---

[1] Both of these earlier shooting events were widely publicized in local, national, and even international news media outlets, and the occurrence of these events and the media reports cannot be reasonably disputed. The Court may take judicial notice of such media reports of the two earlier events – which were widely known in the community. See Fed.

Amendment rights to video record the Officers (apparently while also claiming a right to openly wear a firearm as he carried out the videoing), he was absolutely immune from any contact initiated by Police Officers who wanted to find out what he was doing. Therefore, according to Plaintiff, the events amount to an infringement of his rights under the First and Fourth Amendments. Plaintiff fails to state a claim against the City because he only provides conclusory allegations which are insufficient to show the existence of a City policy or custom by a policymaker that caused a violation of his Constitutional rights. In fact, taking the allegations in the Complaint at face value, the allegations do not show a violation of a Constitutional right committed by any Defendant and the claims therefore fail as to all Defendants. The individuals are also entitled to qualified immunity to the claims against them.

## II.  IDENTIFICATION OF LIVE PLEADING & SUMMARY OF CLAIMS

### A.  Live Pleading & Summary of Claims Against Defendants

Plaintiff's live pleading is the Plaintiff's First Amended Complaint filed herein November 9, 2015 (Doc. 17). His claims are:

1.      Alleged interference with a First Amendment right to videotape the Addison Police Department or Addison Police Officers (Complaint, Doc. 17 p. 17 ¶ 125(a));

2.      Alleged excessive force when Officer Bagley used a leg sweep and handcuffed him (Complaint, Doc. 17 p. 15 ¶ 117(c));

3.      Alleged Fourth Amendment violation for an alleged unlawful detention or arrest (Complaint, Doc. 17 p. 15 ¶ 117(a), (b) & (d);

---

R. Evid. 201, together with numerous cases recognizing a court may judicially notice widespread media articles and reports of well-known events. <u>Bell Atlantic Corporation v. Twombly</u>, 550 U.S. 544, 568 fn 13 (2007); <u>Valley Broadcasting Company v. U.S. District Court for Nevada</u>, 798 F.2d 1289, 1290 fn 1 (1986); <u>Condit v. Dunne</u>, 317 F.Supp.2d 344, 357-8 (S.D.N.Y. 2004); <u>In Re American Apparel, Inc. Shareholder Litigation</u>, 2013 WL 174119 at p. 11-12 (N.D. Cal. 2013), citing <u>Twombly</u>. The <u>American Apparel</u> case recognized that widespread media reports could be judicially noticed to show that the market was aware of information contained in the news articles. A simple Google search "Garland terrorist attack" leads to numerous citations to news articles referencing the May 4, 2015 attack at the "Curtis Caldwell Center." A simple Google search "Dallas Police Headquarters attack" leads to numerous local, national and even international news media outlet reports of the June 13, 2015 incident.

## B. <u>Summary of Plaintiff's Allegations</u>

On June 25, 2015 between 12:30-12:45 p.m., Plaintiff was using a video camera mounted on a tripod across the street from the Addison Police Department Headquarters building. He was videotaping the portion of the building where Police Officers entered and exited the parking lot and building. (Complaint, Doc. 17 p. 3 ¶ 13). Plaintiff was dressed in shorts and a t-shirt and cap and wearing a backpack. (Complaint, Doc. 17 pp. 3-4 ¶ 14). Plaintiff was wearing a holstered pistol in plain view with his t-shirt tucked inside the holstered pistol handle to make the pistol more visible (Complaint, Doc. 17 p. 4 ¶ 14).[2] Officer Bagley approached Plaintiff, questioned him, advised Plaintiff that he was under detention, and Officer Bagley asked for Plaintiff to identify himself or provide identification. (Complaint, Doc. 17 pp. 4-6 ¶¶ 18-48). Officer Bagley explained that Mr. Sanders' actions, which included video recording, were making the Police nervous and he did not know why Sanders was doing this video recording and wanted to know if Sanders was plotting to do something to the Police Department. (Complaint, Doc. 17 p. 6 ¶¶ 52-54 & p. 7 ¶ 65).[3] Despite repeated requests for Plaintiff to identify himself, he would not do so and continued using his tripod mounted camera for video recording. (Complaint, Doc. 17 p. 9 ¶ 84).  Plaintiff

_____

[2] Plaintiff claimed at the time and continues to claim that it was a pre-1899 black powder pistol which he could openly carry without violating Texas laws in effect at that time pertaining to openly carrying handguns (Doc. 17 p. 4 ¶ 14).. Apparently Plaintiff relies on Texas Penal Code § 46.01(3)(A) & (B). While the Texas Legislature has decided to exempt such black powder weapons from provisions limiting openly carrying firearms, courts nonetheless recognize that an antique firearm or replica firearm can in fact be a deadly weapon. <u>Escobedo v. State</u>, 6 S.W.3d 1, 7 (Tex. App. – San Antonio 1999, discretionary review refused 2005). The undersigned defense counsel makes no claim to being a firearms expert, but is instead a student of history, and suggests that the firearm Plaintiff was carrying may have been a cap and ball black powder revolver, perhaps similar in type to Wild Bill Hickok's preferred matching handguns – 1851 Navy revolvers, 36 caliber – deadly weapons as a number of Mr. Hickok's opponents could attest – had they survived to do so. Interestingly, even though Wild Bill preferred cap and ball black powder revolvers (which likely would be exempt today under § 46.01(3)(A) & (B)), the handgun Mr. Hickok was carrying at the time of his death was a Smith & Wesson Model 2 Army revolver, 32 caliber rim fire – unsuccessfully offered for auction November 18, 2013. That weapon in Wild Bill's possession at the time of his death on August 2, 1876 would not be exempt under Penal Code § 46.01, even though it was manufactured prior to 1876 – obviously before 1899 – because the Smith & Wesson Model 2 used rim fire ammunition. Thus, not all antique revolvers are exempt under § 46.01(3)(A) & (B).

[3] See footnote 1 – reasonably explaining the nervousness of Officer Bagley and other Officers who might see a man in civilian clothing wearing a backpack and a handgun video recording the parking lot used by Police Officers at Police Headquarters.

then told Officer Bagley that Plaintiff was going to take out a cell phone, Officer Bagley told him not to do so – even though at this point Plaintiff admits he was not under arrest. (Complaint, Doc. 17 p. 9 ¶ 85). Plaintiff again announced that he was going to take out his cell phone and started to do so even though he been ordered not to do so by Officer Bagley. (Complaint, Doc. 17 pp. 8-9 ¶¶ 75-88). Officer Bagley took away Plaintiff's video camera and placed it on the ground. (Complaint, Doc. 17 p. 9 ¶ 89).[4] As Plaintiff continued his efforts to take out or use his cell phone, despite Officer Bagley's instructions not to do so, Officer Bagley used a leg sweep to take Plaintiff to the ground (on a grassy area). Plaintiff was handcuffed once he was on the ground. (Complaint, Doc. 17 p. 10 ¶ 91). Officer Bagley then called for backup and other Officers, including Lt. Vincent and Officer Jones arrived. (Complaint, Doc. 17 p. 10 ¶¶ 92-95). (*While Plaintiff does not specifically state this in the Complaint, his handgun was removed from him at about this time and Officers examined the handgun trying to determine if it was operable, was loaded, how it could be loaded or unloaded – this went on while Plaintiff mentioned a couple of times that it was a pre-1899 black powder handgun.*) Plaintiff states that Lt. Vincent, or the other Defendants, kept him in handcuffs for a total of approximately 20 minutes and that Officer Jones kept his hand or hands on Plaintiff the entire time. (Complaint, Doc. 17 p. 10 ¶ 95). (*Plaintiff fails to mention that when he stated he did not want an Officer's hands on him, he was given the option of being allowed to sit on the grass, Plaintiff would not agree to this even after being told an Officer had his hand on him because Plaintiff's legs still worked – meaning that he could try to run away. Plaintiff fails to tell the Court that he never identified himself and therefore during the following conversation he was referred to by the Officers as "John". While Plaintiff complains about being held for a total of about 20 minutes, he fails to tell the Court that when Officers at the scene realized that his gun*

---

[4] Plaintiff artfully omits the fact that the video camera was never turned off by Officer Bagley or any of the other Officers who responded and in fact Plaintiff had posted pieces of the video and audio recording (which he edited and added commentary to) on YouTube which continued throughout his encounter with Police Officers.

*might be an exempt pre-1899 black powder gun, and that it was not loaded, and that they eventually determined he did not appear to be an immediate threat of harm, he was released at the scene and all of his property was returned to him at the scene – including his handgun.*)

### III.  LEGAL STANDARD FOR MOTION TO DISMISS

Defendants move for dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure, which authorizes certain defenses to be presented via pretrial motions. A Rule 12(b)(6) motion to dismiss argues that, irrespective of jurisdiction, the complaint fails to assert facts that give rise to legal liability of the defendant. The Federal Rules of Civil Procedure require that each claim in a complaint include "a short and plain statement . . . showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The claims must include enough factual allegations "to raise a right to relief above the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570).

Rule 12(b)(6) provides that a party may move for dismissal of an action for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). The Court must accept as true all well-pleaded facts contained in the plaintiff's complaint and view them in the light most favorable to the plaintiff. Baker v. Putnal, 75 F.3d 190, 196 (5th Cir. 1996). In deciding a Rule 12(b)(6) motion, "[f]actual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555; Gonzalez v. Kay, 577 F.3d 600, 603 (5th Cir. 2009). "The Supreme Court recently expounded upon the Twombly standard, explaining that '[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" Gonzalez, 577 F.3d at 603 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 677-678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "It follows, that 'where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not 'shown' - 'that the pleader is entitled to relief.'" *Id*.

In Iqbal, the Supreme Court established a two-step approach for assessing the sufficiency of a complaint in the context of a Rule 12(b)(6) motion. First, the Court identifies conclusory allegations and proceeds to disregard them, for they are "not entitled to the assumption of truth." Iqbal, 556 U.S. at 680. Second, the Court "consider[s] the factual allegations in [the complaint] to determine if they plausibly suggest an entitlement to relief." *Id*. "This standard 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary claims or elements." Morgan v. Hubert, 335 F. App'x 466, 470 (5th Cir. 2009). This evaluation will "be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679. The Complaint is devoid of sufficient information to meet the standards of Iqbal. The Complaint should be dismissed.

## IV.  FAILURE OF § 1983 CIVIL RIGHTS CLAIMS
### A.  Overview of Civil Rights Claims

Plaintiff brings § 1983 civil rights claims against all Defendants. Plaintiff makes an attempt to assert several civil rights claims against the City for an alleged custom, practice or policy of allegedly allowing interference with First Amendment rights and allegedly somehow allowing excessive force and unlawful detentions or arrests in violation of the Fourth Amendment, applicable to state actors through the Fourteenth Amendment.

### B.  Plaintiff Does Not Meet Requirements for a Civil Rights Claim Against the City
#### 1.  Basic Facts Plaintiff Must Plead Against City

It is well settled that the Defendant City cannot be held liable for civil rights violations

under a theory of Respondeat Superior. <u>Monell v. New York City Department of Social Services</u>, 436 U.S. 658, 694 (1978).  The Defendant City cannot be sued and subjected to damages unless its official policy or custom caused the Plaintiff to be deprived of a federally protected right. <u>Board of County Commissioners v. Brown</u>, 520 U.S. 397, 403 (1997). Therefore, in order to support a claim based on the existence of a custom or policy, Plaintiff must plead facts to show that (1) a policy or custom existed; (2) governmental policy makers actually or constructively knew of its existence; (3) a Constitutional violation occurred; and (4) the custom or policy served as the moving force behind the violation. <u>Meadowbriar Home for Children, Inc. v. Gunn</u>, 81 F.3d 521, 532-33 (5th Cir. 1996). Plaintiff's description of the policy or custom and its relationship to the underlying Constitutional violation cannot be conclusory; it must contain specific facts. <u>Spiller v. City of Texas City</u>, 130 F.3d 162, 167 (5th Cir. 1997).  Plaintiff must establish that his claims are based on Defendant's official policy, not the policy of an individual official. <u>Bennet v. City of Slidell</u>, 728 F.2d 762, 769 (5th Cir. 1984). Plaintiff's main complaint against the City of Addison is that the City allegedly does not have adequate policies. (Complaint, Doc. 17 pp. 15-17 ¶¶ 120-127).

## 2.  <u>Plaintiff Does Not Identify A Policymaker</u>

Plaintiff may not simply assert conclusory allegations about the Police Chief serving as a policymaker, and then contend that such allegations are sufficient to withstand a Rule 12(b)(6) Motion to Dismiss. Here, Plaintiff attempts to identify the Police Chief as a policymaker by name or description or position with the City. (Complaint, Doc. 17 p. 10 ¶¶ 97-98 and p. 16 ¶ 125). To avoid dismissal, the Plaintiff must plead specific facts rather than conclusory allegations. Conclusory allegations simply are insufficient to withstand a Motion to Dismiss.  <u>Guidry v. Bank of LaPlace</u>, 954 F.2d 278, 281 (5th Cir. 1992); <u>Chiras v. Miller</u>, 432 F.3d 606, 611 (5th Cir. 2005). Without any factual information supporting the conclusory allegation that the City's Police Chief

is a policymaker, Plaintiff tries to dodge dismissal of the claims against the City. Plaintiff does not and cannot provide any factual allegations that the City of Addison delegated final decision-making authority to the Police Chief and that such final decision-making could not be reviewed. City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988). Moreover, it is settled Texas law that generally a City Council is a policymaker, and the City cannot delegate policymaking or final decision-making unless it is done so by adoption of a resolution or ordinance approved by the governing body (City Council). There is no such factual allegation herein. Tara Partners v. City of South Houston, 282 S.W.3d 564, 568 (Tex. App. – Houston [14th Dist.] 2009); City of San Benito v. Rio Grande Valley Gas Company, 109 S.W.3d 750, 757 (Tex. 2003). In this case, Plaintiff simply makes nothing but conclusory allegations without even describing the factual basis of any claim that any policymaker was involved.

Plaintiff's broad conclusory formulaic recitations are not sufficient to establish the existence and involvement of a municipal policymaker. These allegations are similarly vague compared to allegations the Supreme Court found inadequate. Iqbal, 556 U.S. at 680-681. For this reason, the claims against the City fail.

### 3.  Plaintiff Does Not Identify a Policy

Plaintiff has not pointed to any specific facts to show that any City policy or custom whatsoever was involved in or caused a violation of civil rights. Other than conclusions, Plaintiff does not provide specific facts to show a widespread custom that was involved or caused a violation of civil rights. Plaintiff has not (and cannot) point to any specific existing policies or customs that caused a violation of a Constitutional right. The Complaint fails under Iqbal and Monell. (Complaint, Doc. 17 pp. 15-17 ¶¶ 120-127).

### C.  Plaintiff Does Not Show a Civil Rights Violation Committed by Anyone

It is fundamental that in order for Plaintiff to establish a civil rights claim sufficient to

withstand dismissal, whether the claim is brought against the City or brought against Lt. Vincent, Officer Jones or Officer Bagley, Plaintiff must at least establish a factual basis for an alleged civil rights violation. Plaintiff fails to do so, and in fact the admissions in his Complaint negates a civil rights violation having been committed by anyone. Iqbal, 556 U.S. at 677-678; Monell, 436 U.S. at 694; Meadowbriar, 81 F.3d at 532-33.

It is settled that municipal liability attaches only where a custom, policy or practice attributable to the municipality itself was the moving force behind a violation of a Constitutional right. City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986). The Courts uniformly recognize that absent a Constitutional violation, there is no claim against a municipality regardless of the municipality's custom or policies. Baker v. Smiscik, 49 F.Supp.3d 489, 501 (E.D. Mich. 2014). Because the facts alleged by Plaintiff fail to show a Constitutional violation committed by anyone, the claims against all of the Defendants, including the City, fail and should be dismissed.

### 1. **The First Amendment is No Talisman Barring the Officers' Conduct of Initiating & Carrying Out the Detention**

#### (a) **General Standards for Investigatory Detention**

It is very well settled that an Officer may temporarily detain a person for an investigation without probable cause to arrest if the Officer has reasonable suspicion supported by articulable facts that criminal activity may be afoot. Such a determination does not violate the Fourth Amendment. Terry v. Ohio, 392 U.S. 1, 21 (1968); United States v. Sokolow, 490 U.S. 1, 7 (1989).

#### (b) **Initiating & Carrying Out the Detention was Lawful**

In this case, Plaintiff wields the First Amendment as if it is a talisman preventing the Police Officers from making any contact with him whatsoever despite his obvious efforts to draw attention to himself. This Court must recognize that even giving Plaintiff the benefit of the doubt and accepting his self-serving allegations in the Complaint as true, it is settled that conduct which is entirely legal may give rise to a reasonable suspicion allowing Police Officers to initiate an

investigatory detention. See United States v. Sokolow, 490 U.S. 1, 9-10 (1989). In Sokolow, the Supreme Court rejected the Ninth Circuit's attempt to require some evidence of ongoing wrongful or criminal behavior in order to initiate and continue an investigatory detention. The Sokolow court recognized that even the seminal case regarding lawful investigatory detentions involved a series of acts, each of them perhaps innocent if viewed separately, but when taken together warranted further investigation. Sokolow, 490 U.S. at 9-10, citing Terry.[5] Assuming for the sake of argument that this Court, or the Fifth Circuit, or the Supreme Court might decide that Plaintiff has some right under the First Amendment to video record the activities he says he was recording, that right simply cannot operate as a talisman barring the Police Officers from taking action under the circumstances Plaintiff himself admits.

Defendants point to a Sixth Circuit case involving strong factual parallels to the present case wherein the Court briefly summarized the facts that had parallels to the present case and the Court went on to state that the Police Officer in that case permissibly encountered, disarmed and detained that plaintiff notwithstanding that plaintiff's rights to possess his gun. Embody v. Ward, 695 F.3d 577, 579 (6th Cir. 2012). It is important to recognize that the encounter provoked by the plaintiff in the Sixth Circuit case included that plaintiff's carrying of an audio recording device. The Sixth Circuit stated:

> "Tennessee law allows individuals with gun permits to carry handguns in public places 'owned or operated by the state' such as 'public park[s]' and 'natural area[s].' Tenn.Code § 39–17–1311(b)(1)(H). The statute defines a 'handgun' as

---

[5] Diligent research by the undersigned has not led to either a United States Supreme Court decision or a Fifth Circuit Court of Appeals decision wherein the Court states that there is a clearly established right to videotape public officials performing duties in a public place. While conceding that some District Courts have reached that result within the Fifth Circuit, and that other circuits have reached that result, there remains a split in the circuits with a number of even recent decisions recognizing there is no clearly established right to record Police Officers in all circumstances. Crawford v. Geiger, 2015 WL 5569007 at pp. 8-9 (N.D. Ohio Sept. 22, 2015), citing Kelly v. City of Carlisle, 622 F.3d 248, 262 (3rd Cir. 2010); Szymecki v. Houk, 353 Fed. Appx. 852, 853 (4th Cir. 2009); Montgomery v. Killingsworth, 2015 WL 289934 at pp. 14-15 (E.D. Penn. Jan. 22, 2015); Williams v. Boggs, 2014 WL 585373 at p. 5 (E.D. KY Feb. 13, 2014).

'any firearm with a barrel length of less than twelve inches' that is 'designed, made or adapted' to be fired with one hand. *Id.* § 39–11–106(a)(16).

"Armed with knowledge of this law and one thing more - a Draco AK–47 pistol - Leonard Embody went to Radnor Lake State Natural Area, a state park near Nashville, Tennessee, on a Sunday afternoon. Dressed in camouflage, he slung the gun with its eleven-and-a-half-inch barrel across his chest along with a fully loaded, thirty-round clip attached to it.

"Embody anticipated his appearance at the park would attract attention - he carried an audio-recording device with him - and it did. One passer-by spontaneously held up his hands when he encountered Embody. Two park visitors reported to a park ranger that they were 'very concerned' about Embody and the AK–47. R.22–3 at 5. And an elderly couple reported to a ranger that a man was in the park with an 'assault rifle.' *Id.* at 6.

"Two more predictable things happened. A park ranger disarmed and detained Embody to determine whether the AK–47 was a legitimate pistol under Tennessee law, releasing him only after determining it was. And Embody sued the park ranger, claiming he had violated his Second, Fourth and Fourteenth Amendment rights.

"For his troubles, Embody has done something rare: He has taken a position on the Second and Fourth Amendments that unites the Brady Center to Prevent Gun Violence and the Second Amendment Foundation. Both organizations think that the park ranger permissibly disarmed and detained Leonard Embody that day, notwithstanding his rights to possess the gun. So do we."

Embody, 695 F.3d at 579. Under the circumstances in Embody, the entire detention took two and a half hours to resolve that the firearm at issue qualified as a handgun under Tennessee law so that it could be openly carried in a public park. In contrast, in the present case, while the Officers were evaluating Plaintiff's pistol and otherwise taking steps to investigate and evaluate the situation, the entire period of detention was only 20 minutes or so.

Even more recently, a court in Michigan considered a case with strong factual parallels to the present. In that case, the Court stated that the Plaintiff – James Baker – entered a Dunkin Donuts shop to have a cup of coffee and donut while openly carrying a pistol, a rifle, a copy of the U.S. Constitution, and a recording device. A manager of the donut store called the Police and as soon as the Officers arrived, Plaintiff activated his recording device. The Officer who first approached Plaintiff Baker drew his weapon. Baker v. Smiscik, 49 F.Supp.3d 489, 492 (E.D. Mich.

2014). The Officers ordered Mr. Baker to place his hands on his head and the Officers took away his rifle and pistol and asked for his identification, which Mr. Baker refused to present. <u>The Officer then took Mr. Baker's wallet from his jacket pocket even though the Plaintiff stated he did not consent to a search of his person</u>. All of this initial activity took place inside the restaurant and occurred within about 3 minutes. Within 3 minutes, one of the Officers noted that the Plaintiff was not violating the law by openly carrying his firearms. At that point, Mr. Baker indicated that he would leave the area and would have left the area. About 13 minutes and 20 seconds into this encounter with the Police, Mr. Baker tried to return his copy of the Constitution to his person and one of the Officers then forced his hand under the Plaintiff, apparently making contact between the two.

The Officers then allegedly lectured Mr. Baker about openly carrying his pistol and rifle, the manager of the donut store asked Plaintiff to leave and not return. The Officers then escorted Plaintiff out of the donut store and placed Mr. Baker's pistol and rifle in the trunk of Baker's car and watched him leave. This entire encounter lasted about 30 minutes – 10 minutes less than the encounter between Plaintiff Sanders and the Officer Defendants herein. <u>Baker</u>, 49 F.Supp.3d at 493.

Relying heavily on the Sixth Circuit's <u>Embody</u> case, the <u>Baker</u> Court found that the Officers had acted reasonably under exigent circumstances which included the threat to the safety of the Officers and potential innocent bystanders in the area. The Court found no Fourth Amendment violation. The Court stated there was certainly no violation of the standards applicable to an investigatory detention – a <u>Terry</u> stop. <u>Baker</u>, 49 F.Supp.3d at 497-498. In <u>Baker</u>, the Court stated that because Mr. Baker had refused to assist with the Officers' investigation by failing to identify himself or produce identification, this only compounded the Officers' concern that Plaintiff may be engaged in criminal activity. <u>Baker</u> at 498. The <u>Baker</u> Court cited a Supreme

Court decision which recognized that a request for identification has an immediate relation to the purpose, rationale and practical demands of a Terry stop. Baker at 498, citing Hiibel v. Sixth Judicial District Court, 542 U.S. 177, 188 (2004).

In Baker and Embody, as it appears in the present case, the Plaintiffs apparently were not engaged in violation of their state's firearm laws and ultimately were determined not to have committed any other criminal act. However, whether a detained suspect is later determined not to have violated the law does not bear on whether the detaining Officer has a reasonable suspicion to justify detention while pursuing an investigation. Baker at 499 fn 7, citing Embody, 695 F.3d at 581. In fact, the Baker Court quoted Embody with approval wherein the Sixth Circuit stated:

> "Having worked hard to appear suspicious in an armed–and–loaded visit to the park, Embody cannot cry foul after park rangers, to say nothing of passers-by, took the bait. The officers stopped him only as long as it took to investigate the legitimacy of the weapon and, at his insistence, bring the supervisor to the park. No Fourth Amendment violation occurred."

Baker at 499 fn. 7. While in this case, Plaintiff makes no assertion that third parties reported unusual activity to the Police, the fact that an observant Officer noticed Plaintiff videoing Officers and their activities in the parking lot used by the Officers at Police Headquarters, in the wake of the recent attacks on a City meeting facility in Garland and Police Headquarters in Dallas certainly made it reasonable for Officer Bagley to approach Plaintiff to ask him what he was doing.[6] Plaintiff himself asserts that he was wearing a handgun intentionally displayed in a way so that it was visible to all. Just like in the Embody and Baker cases, after intentionally drawing attention to himself,

---

[6] The extraordinary times that we all live in must be taken into account when evaluating the Officers' conduct of initiating contact with Plaintiff and continuing the contact to try to ascertain what Plaintiff was doing. At the time of the incident, two recent armed attacks had been made on government buildings. Even more recently, the Court certainly may judicially note the tragic events taking place December 2, 2015 in San Benardino, California in a County facility – the Inland Regional Center – where 14 people were killed, and at least 17 other people were wounded by armed terrorists. The video surveillance of the City of Addison Police Department building, which appeared to focus on the portion of the facilities used by Police Officers to enter and exit the building, and where the Police vehicles were most commonly parked, would be a reasonable basis for a Police Officer to initiate contact with a person conducting the video surveillance.

Plaintiff cannot be allowed to cry foul when an Officer approached him to investigate.

The Supreme Court recognizes there is no rigid time limit on the duration of an investigatory detention. U.S. v. Sharp, 470 U.S. 675, 685 (1985). When considering whether a period of time is excessive, the Courts consider the law enforcement purposes to be served by the stop, as well as the time reasonably needed to effectuate those purposes. U.S. v. Maltais, 403 F.3d 550 (8th Cir. 2005). In the Maltais case, the Court held that detaining a suspect for two hours and 55 minutes in the back of a patrol car while waiting for a drug dog to arrive was not such a long duration as to be unreasonable and constitute an arrest without probable cause.

The detention in Embody lasted over two hours. The detention in Baker lasted about 30 minutes.

Here, Plaintiff was detained for at most 20 minutes as an investigation continued. He states the detention took place at the scene where Officers first encountered him. He states no facts showing the duration of the detention was unreasonable. Any claim that the length of the detention was unreasonable fails.

### (c) **Failure of Claim that Detention was Retaliation Under First Amendment**

Plaintiff makes no claim that he was prosecuted. He simply cannot make such a claim since he was neither given a citation nor arrested, but was instead released at the scene with all of his property – including his handgun – handed back to him. The Supreme Court has recognized that a plaintiff cannot state a claim of retaliatory prosecution in violation of the First Amendment if any underlying charges were supported by probable cause. Reischle v. Howards, 132 S.Ct. 2088, 2093 (2012). In Reischle, the Supreme Court granted certiorari on two questions: Whether a First Amendment retaliatory arrest claim may lie despite the presence of probable cause to support the arrest; and whether clearly established law at the time of the arrest in that case so held. The Supreme Court elected only to address the second question – whether or not the law was clearly

established at the time of the Plaintiff's arrest in that case. Therefore, the Supreme Court did not itself squarely address whether or not a First Amendment right to be free from retaliatory arrest supported by probable cause existed. Nonetheless, the Supreme Court did find that since there was no clearly established right to be free from arrest in retaliation for exercising First Amendment rights when the arrest was supported by probable cause, the individual Officers were entitled to qualified immunity. Reischle at pp. 2093-2094.

After Plaintiff provided a number of factual allegations, when viewed objectively, that would support the actions of the Officers in initiating contact with him, and then detaining him, (see Section II above), Plaintiff then refers to a report of the incident written by Officer Bagley. (Doc. 17 pp. 11-13 ¶¶ 103-107). Plaintiff's Complaint waxes poetic as to his contentions about the effect of the content of the report and Plaintiff's Complaint focuses more on information that is not stated in the report and from there Plaintiff makes contentions about apparent subjective intent or state of mind of Officer Bagley. Because the subjective intent of the Police Officers is not relevant to determination of whether or not an arrest based on probable cause is reasonable and therefore lawful under the Fourth Amendment standards, the alleged existence of a retaliatory motive for an arrest simply does not defeat an arrest. Devenpeck v. Alford, 543 U.S. 146, 153-154 (2004). Here, Plaintiff asserts he was arrested, but he was not. However, viewed objectively, since there certainly was ample reasonable suspicion justifying an investigatory detention under Terry, the fact that Plaintiff claims he was exercising First Amendment rights does not eliminate the reasonable suspicion to conduct an investigatory detention. In short, there was no First Amendment violation. The detention (or arrest as alleged by Plaintiff) certainly was supported by governing standards. In short, the First Amendment retaliation claim fails and any claim based on the detention (or alleged arrest) likewise fails. This claim must be dismissed.

## 2. Failure of Excessive Force Claim

### (a) General Standards Governing Excessive Force Claims

A claim of excessive force in the course of an arrest, investigatory stop, or any other "seizure" of a free citizen is analyzed under the Fourth Amendment and its "reasonableness" standard. Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 1871 and n. 10, 104 L.Ed.2d 443 (1989); Hamm v. Powell, 874 F.2d 766 (11th Cir.1989), as modified on rehearing, 893 F.2d 293 (1989). The issue of "reasonableness" requires "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham v. Connor, 109 S.Ct. at 1872.

The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.... With respect to a claim of excessive force, the same standard of reasonableness applies: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," Johnson v. Glick, 481 F.2d [1028], at 1033 [ (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)], violates the Fourth Amendment The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation.

As in other Fourth Amendment contexts, however, inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. 109 S.Ct. at 1872.

### (b)  The Minimal Force Herein was Lawful

The only use of force Plaintiff points to is when Officer Bagley used a leg sweep to place him on the grass and then handcuffed him. Plaintiff makes no complaint that the handcuffs were too tight or even uncomfortable. He claims no abrasions or bruises or scrapes or scratches from the handcuffs. Even if he had received minor swelling or scratches or abrasions from handcuffing, it is recognized in the Fifth Circuit that such handcuffing generally does not amount to excessive force. Glenn v. City of Tyler, 242 F.3d 307, 314 (5th Cir. 2001).

Additionally, it is also recognized that under Terry and its progeny, some use of force during an investigatory stop may be justified if the Officer has reason to believe the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the Officer or others. U.S. v. Hensley, 469 U.S. 221, 235 (1985). The Fifth Circuit has also held that the Officers stayed within the ambit of a valid Terry stop when they encountered three individuals, two of whom fit the description of an armed robber as the three individuals were about to enter a vehicle that may have been used as a getaway car in an armed robbery. The Officers held three of the suspects at gunpoint, handcuffed two of the suspects, and one of the suspects was handcuffed for an approximately 25-minute long detention. U.S. v. Campbell, 178 F.3d 345, 349 (5th Cir. 1999).[7]

With Plaintiff having a pistol on his person, and wearing a backpack containing unknown items, it was certainly reasonable to handcuff him during the investigatory detention. Even though Officer Bagley used a leg sweep to put Plaintiff on the ground, such minor use of force was not unreasonable under the circumstances described by Plaintiff himself. Plaintiff describes being told

---

[7] In Campbell, the Court considered the totality of the circumstances and recognized that drawn guns and handcuffs do not necessarily convert a detention into an arrest. The detention herein was carried out less aggressively – there is no allegation that guns were drawn by Officers, and the entire incident lasted for a shorter period of time than the 25 minutes involved in the stop in the Campbell case.

repeatedly by Officer Bagley not to reach for the object (which Plaintiff claimed was going to be a cell phone) and Plaintiff was ordered repeatedly not to use the cell phone (Doc. 17 pp. 7-9 ¶¶ 65-89). When Plaintiff refused to comply with Officer Bagley's instructions, Officer Bagley used reasonable force to put him on the ground to prepare him for handcuffing and then he was handcuffed. Even under the facts alleged by Plaintiff, a reasonable Officer could suspect that the "cell phone" Plaintiff was reaching for could turn out to be another weapon. Even after Plaintiff states he gained possession of his cell phone, Officer Bagley had a right to reasonably prevent Plaintiff from using the cell phone to either summon others to the scene or to potentially use the cell phone to remotely activate a harmful device.

Applying the Graham Fourth Amendment standards, a District Court in Florida considered an alleged leg sweep under circumstances similar to the present. In that case, a male Officer used a leg sweep on a female detainee/arrestee. The Officer had argued with the Plaintiff. She refused to comply with the Officer's orders. The Officer tried to grab her to carry out handcuffing. The Plaintiff pulled away. The Officer then used a leg sweep technique to take her to the ground so that he could complete the handcuffing process. The Court held that there was no excessive force. Braxton v. Fallis, 2005 WL 5977661 at p. 4-5 (N.D. Fla. 2005).

The use of force in this case simply was not excessive. Plaintiff admits he repeatedly ignored instructions from Officer Bagley. Under the totality of circumstances described by Plaintiff himself, a reasonable Officer could have believed the force was necessary to not only complete the detention and handcuff Plaintiff, but to potentially prevent Plaintiff from obtaining or using a weapon or harmful device. Any excessive force claim fails and must be dismissed.

## V.  IMMUNITY OF INDIVIDUALS

All of the individual Defendants assert that at all times they had dealings with, or interaction with Plaintiff, they did so in their official capacities, and they acted in a good faith

performance of their official discretionary authority. The individual Defendants did not knowingly violate any of Plaintiff's clearly established rights. All of the individual Defendants are entitled to official immunity and qualified immunity as to any causes of action asserted against them. <u>Hogan v. Cunningham</u>, 722 F.3d 725, 735 (5th Cir. 2013). In order to overcome the individual immunity of these Defendants, Plaintiff bears the burden of showing that a public official facing the same or substantially similar circumstances would have known, in view of governing law, that their conduct violated a clearly established right. <u>Hogan v. Cunningham</u>, 722 F.3d 725, 735 (5th Cir. 2013). As set forth in Section IV, Plaintiff's allegations are not even sufficient to establish a civil rights violation. Therefore, a reasonable public official facing the same or similar circumstances would not have known that their conduct violated a clearly established right. For these reasons, Plaintiff has failed to penetrate the immunity of the individuals – despite his assertion that qualified immunity does not apply. (See Doc. 17 pp. 17-18 ¶¶ 128-134.) For these reasons, the Officers' immunity is not defeated and all claims against them must be dismissed.

## VI.   <u>ALTERNATE REQUEST FOR A REPLY PURSUANT TO FED. R. CIV. P. 7(a)</u>

### A.   <u>Overview of Plaintiff's Claims</u>

Plaintiff's central theory seems to be that because he was engaged in conduct he contends is protected under the First Amendment, and because the handgun he was wearing was a pre-1899 replica antique, he was absolutely entitled to videotape Addison Police Headquarters and the comings and goings of Officers in the parking lot, and that no Officer could lawfully make contact with him and to carry out an investigatory detention. For the reasons explained above, the Officers certainly were entitled to initiate contact and then carry out an investigatory detention. However, if the Court does not dismiss all of the claims outright at this stage, Defendants note that Plaintiff simply has inadequately stated a claim against them and has omitted important facts that must be analyzed in the context of the immunity defenses asserted by the individuals.

## B. <u>Requirements for Factually Specific Allegations</u>

The Fifth Circuit makes it clear that the immunity defense should be resolved at the earliest stages. <u>Schultea v. Wood</u>, 47 F.3d 1427, 1430 (5th Cir. 1995). The United States Supreme Court approves of the same procedure. <u>Crawford-El v. Britton</u>, 523 U.S. 574, 597-598 (1998).  When public officials such as Defendant have asserted the affirmative defense of immunity, the District Court should require the Plaintiffs to reply to that defense in detail.  By definition, a Reply pursuant to Fed. R. Civ. P. 7(a) must be tailored to the assertion of qualified immunity and fairly engage the Defendant's allegations.  <u>Schultea</u>, 47 F.3d at 1433. Ordinarily, a defendant would be able to assert his immunity defense with some specificity in an Answer or other appropriate filing. Here, the Complaint is devoid of necessary factual allegations as to the Defendants collectively and as to the Defendants individually. However, the Court, guided by the Fifth Circuit's <u>Schultea</u> case in the Supreme Court's <u>Crawford-El</u> case, together with the <u>Iqbal</u> case, should recognize the inadequacy of the Complaint and order Plaintiff to provide a specific factual basis for his claims, and the Court should direct Plaintiff to provide sufficient facts, if he can, to penetrate the immunities of the individual Defendants.

## C. <u>Defendants' Specific Factual Assertions of Immunity</u>

Defendants have supplied immunity facts in accordance with the suggestion of the <u>Schultea</u> case, and such facts are stated in the Answer at paragraphs 3.01-3.11 as follows:

"**3.01**   Pursuant to the procedure set forth in <u>Schultea v. Wood</u>, 47. F.3d 1427 (5th Cir. 1995), the individual Defendants hereby set forth some factually specific assertions in connection with the individual Defendants' official immunity or qualified immunity defense.  This procedure is also a procedure approved by the United States Supreme Court. <u>Crawford-El v. Britton</u>, 523 U.S. 574, 597-598 (1998).  In connection with this, Defendants are also concurrently filing a Motion requesting that the Court require Plaintiff to file a Reply pursuant to Fed. R. Civ. P. 7(a).

"**3.02**   At all times relevant to the subject incident, Officer Bagley and Officer Jones were on duty working as City of Addison Police Department Officers, they were wearing immediately recognizable dark blue Police Officer uniforms including their badges of office, shoulder patches, and equipment belts. At all relevant times, Lt. Vincent was in

plain clothes, but was wearing his Police Officer badge and a Police approved sidearm and was both recognizable as a Police Officer and he identified himself as a Police Officer. The three individual Defendants were immediately recognizable as Police Officers.

"**3.03**   The incident occurred on or about June 25, 2015, a date about 7 weeks after two individuals fired shots at the entrance to the Curtis Caldwell Center (a publicly operated facility in Garland) and a date approximately 12 days after an individual fired a number of shots at the City of Dallas Police Department Headquarters building entrance. Plaintiff was observed apparently using a video camera on a tripod to conduct video surveillance of a portion of the Police Department building where Officers park their patrol cars, and where Officers enter and exit the building adjacent to the parking area. Officer Bagley certainly had reason to make initial contact with Plaintiff to see what he was doing.

"**3.04**   The totality of circumstances facing Officer Bagley after he made contact with Plaintiff provided reasonable suspicion that harmful or criminal activity was afoot, or could be afoot. Thus, initiation and continuation of an investigatory detention was lawful. Because Plaintiff would not cooperate and refused to put his phone away and continued to keep trying to use the phone for an unknown reason, Officer Bagley determined that it may be necessary to use reasonable force to continue the investigatory detention. Therefore, Officer Bagley removed the video camera on the tripod from Plaintiff's hand and Officer Bagley laid that video camera on the grass carefully so as not to damage it. Officer Bagley did not turn off or even attempt to turn off that video camera and allowed it to continue running throughout the remainder of the incident and until it was returned to Plaintiff after the incident.

"**3.05**   Plaintiff was wearing a backpack containing unknown items. Although Plaintiff was wearing a handgun, Officer Bagley did not immediately notice the handgun because of Plaintiff's position. Nonetheless, when Officer Bagley and other Officers noticed the handgun, the handgun did appear to be a potentially deadly weapon regardless of whether the weapon was as described by Plaintiff – a pre-1899 black powder weapon, which he states he could openly carry.

"**3.06**   The circumstances leading to initial contact with Plaintiff and the initiation and continuation of an investigatory detention included: Plaintiff's actions of videoing or surveilling Police headquarters or Police activities at the part of the building where Police Officers park and enter and exit – areas of access not generally used by the public; the incident took place twelve days after the shooting event at the entrance of the Dallas Police Department Headquarters, and seven weeks after a shooting at the entrance to a publicly operated building in Garland; Plaintiff was wearing a backpack containing unknown items; Plaintiff refused to provide basic information about himself or his actions even after an Officer or Officers expressed some of the reasons for their concerns to him; Plaintiff reached to take out an object (which he stated was a cell phone) despite being told not to do so; Plaintiff then attempted to use the cell phone for unknown purposes, despite being told not to do so; Plaintiff's actions raised immediate concerns about Officer safety because the cell phone could have been used to request other people to come to the scene, or the cell phone could have a capability of remotely activating a harmful device; Plaintiff pulled away from the Officer's attempt to take the phone; and Plaintiff refused to put the phone away.

"**3.07**   At this point, with Plaintiff continuing to attempt to use his cell phone for an

unknown purpose, Officer Bagley used a leg sweep technique causing the Plaintiff to go to the ground on a grassy area where he could then be handcuffed for safety of the Officer or arriving Officers, as well as the suspect Plaintiff's safety. Controlling the Plaintiff would decrease the likelihood of any need for additional force and decrease the risk of injury to Plaintiff, the Officers, or others in the area.

"**3.08**   Plaintiff did not appear to be injured from the leg sweep or takedown. He did not tell any Officer at the scene he was injured, and later when he came inside the Police building to ask about his cell phone, he did not report any injury. The use of force was minimal and reasonable.

"**3.09**   Officer Bagley and the other Officers realized Plaintiff was wearing a handgun, he was handcuffed and the handgun was removed because it appeared to be a deadly weapon. As the investigatory detention continued with Officers explaining their concerns and questioning Plaintiff about his actions, Plaintiff would not answer the questions or address the concerns of the Officers and Plaintiff explained that his handgun was a type of weapon which may be exempt from requirements regarding openly carrying firearms.

"**3.10**   The investigatory detention continued while Officers examined the handgun and another Officer communicated with Plaintiff; after it was determined that the handgun did not appear to be loaded, it appeared not to be modern in operating features, and after it was reasonably confirmed that Plaintiff did not appear to be preparing to engage in dangerous or criminal activity, and when Plaintiff was determined not to be an immediate danger, he was released and his property was returned. The returned property included Plaintiff's cell phone and handgun, and video camera, which the Officers had allowed to remain running through the incident.

"**3.11**   A reasonable Officer under the same or similar circumstances could have believed that the initial contact and the initiation and continuation of an investigatory detention was lawful and did not violate any of Plaintiff's clearly established rights."

### D.  <u>Complaint Is Not Sufficient</u>

As pointed out, the Complaint does not, with adequate factual specificity, provide facts which, if true, would penetrate the immunity of any Defendant. The Complaint is not sufficient to overcome a Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6) because it is a collection of conclusory allegations, and ignores facts that must be addressed in the context of an excessive force claim and an analysis of the immunity defense. In accordance with the Fifth Circuit's well-settled <u>Schultea</u> procedure, and in accordance with the procedure recommended by the United States Supreme Court, Plaintiff should be required to file a factually specific Reply to the immunity assertions of each Defendant. *See generally*:  <u>Crawford-El v. Britton</u>, 523 U.S. 574, 597-598

(1998).

## VII.  <u>DISCOVERY MUST BE STAYED</u>

The qualified immunity defense must be decided before discovery can proceed in this case. *See* <u>Hunter v. Bryant</u>, 502 U.S. 224, 227 (1991) (noting that "we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation"). All discovery therefore should be stayed pending a ruling on Defendant's present Motion, and pending further order of the Court. *See* <u>Ashcroft v. Iqbal,</u> 556 U.S. 662, 685-86 (2009); <u>Wicks v. Miss. State Employees Servs., Inc.</u>, 41 F.3d 991, 994-95 (5th Cir. 1995); *accord* <u>Foreman v. Texas A&M Univ. Sys. Health Sci. Ctr.</u>, No. 3:08-cv-1469-L, 2008 WL 494267, at *4 (N.D. Tex. Nov. 12, 2008) (citing <u>Wicks</u> in ruling that discovery is stayed pending a ruling on an individual defendant's dispositive motion); *see generally* <u>Zapata v. Melson</u>, ___ F.3d ___, 2014 WL 1545911 (5th Cir. Apr. 18, 2014)*;* <u>Backe v. LeBlanc</u>, 691 F.3d 645 (5th Cir. 2012); <u>Lion Boulos v. Wilson</u>, 834 F.2d 504 (5th Cir. 1987).

After the Court has ruled on the pending motion to dismiss, if the case is not dismissed, the Court may, as necessary, issue an order setting forth appropriate procedures and deadlines for further proceedings in this case.

**WHEREFORE, PREMISES CONSIDERED**, Defendants pray that the Court dismiss all of the claims against all Defendants, or alternatively the Court order Plaintiff to file a Rule 7(a) Reply to the immunity assertions, and that the Court stay discovery until the immunity defense is resolved.

Respectfully submitted,

__/s/James T. Jeffrey, Jr.__
**JAMES T. JEFFREY, JR.**
State Bar No.: 10612300
**LAW OFFICES OF JIM JEFFREY**
2214 Park Springs Blvd.
Arlington, Texas 76013
Phone No.: (817) 261-4640
Fax No.: (817) 275-5826
**ATTORNEY FOR DEFENDANTS**
**CITY OF ADDISON, LT. MIKE VINCENT,**
**OFFICER T. BAGLEY, & OFFICER B. JONES**


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing is being forwarded this 14th day of December 2015, the foregoing was electronically filed with the Electronic Case Filing System for the Northern District of Texas and electronic notice of this filing was given to counsel for Plaintiff via the ECF System.

__/s/James T. Jeffrey, Jr.__
JAMES T. JEFFREY, JR.